UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

JARVIS ROBERTS, GREGORY ROBERTS, and
KENDALL MASSEY

                                          Plaintiffs,

-against-

THE CITY OF NEW YORK, POLICE OFFICER GEORGE AZIZE, SHIELD NO. 16004, POLICE OFFICER THEODORE PETERS, SHIELD NO. 13285, JOHN DOE #1-4

                                          Defendants.

**COMPLAINT AND JURY DEMAND**

Docket No.

------------------------------------------------------------------------ x

## PRELIMINARY STATEMENT

1. This is a civil rights action in which plaintiffs seek relief for the violation of their rights secured by 42 USC §1983 and the Fourth and Fourteenth Amendments to the United States Constitution, and the laws and Constitution of the State of New York.

2. The claims arise from a February 1, 2014 incident, in which Officers of the New York City Police Department ("NYPD"), acting under color of state law, intentionally and willfully subjected plaintiffs to false arrest and malicious prosecution.

3. Plaintiffs seek monetary damages (special, compensatory, and punitive) against defendants, as well as an award of costs and attorneys' fees, and such other and further relief as the Court deems just and proper.

## JURISDICTION

4. This action is brought pursuant to 28 U.S.C. §1331, 42 U.S.C. §1983, and the Fourth and Fourteenth Amendments to the United States Constitution.

5. Venue is laid within the United States District Court for the Eastern District of New

York in that Defendant City of New York is located within, and the events occurred within, the boundaries of the Eastern District of New York.

## PARTIES

6. Plaintiffs Jarvis Roberts, Gregory Roberts, and Kendall Massey are residents of Kings County, New York.

7. The City of New York (or "the City") is a municipal corporation organized under the laws of the State of New York. At all times relevant hereto, Defendant City, acting through the New York Police Department (or "NYPD"), was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters and was responsible for the appointment, training, supervision, discipline and retention and conduct of all NYPD personnel. In addition, at all times here relevant, Defendant City was responsible for enforcing the rules of the NYPD, and for ensuring that the NYPD personnel obey the laws of the United States and the State of New York.

8. Police Officer George Azize, Shield No. 16004 and Police Officer Theodore Peters, Shield No. 13285 were, at all times here relevant, police officers of the NYPD, and as such were acting in the capacity of an agent, servant and employee of the City of New York. On information and belief, defendants Azize and Peters were involved in the illegal arrest of plaintiffs and/or failed to intervene in the actions of their fellow officers. Defendants Azize and Peters are sued in their individual capacity.

9. All other individual defendants ("the officers"), including John Doe #1-4, individuals whose names are currently unknown to plaintiff, are employees of the NYPD, and are sued in their individual capacities.

10. At all times here mentioned defendants were acting under color of state law, to wit,

under color of the statutes, ordinances, regulations, policies, customs and usages of the City and State of New York.

## FACTUAL ALLEGATIONS

11. Plaintiffs Jarvis Roberts, Gregory Roberts and Kendall Massey are family members.

12. On February 1, 2014, the three plaintiffs were visiting the home of another family member, located at 315 Sutter Ave, Apartment 14F in Brooklyn, New York.

13. At the time of the incident, Willie Roberts was the leaseholder of Apartment 14F in 315 Sutter Avenue, and resided there with several family members.

14. Apartment 14F is a four bedroom apartment.

15. None of the three plaintiffs resided at 315 Sutter Avenue at the time of the incident.

16. Non-party Furman Massey did reside at 315 Sutter Avenue at the time of the incident.

17. On February 1, 2014 at approximately 10:00 pm, defendant police officers entered the residence at 315 Sutter Avenue.

18. Upon information and belief, the police officers did not have a warrant to enter the home, nor had anyone granted consent to the entrance, nor did the officers have other legal basis to enter the home.

19. Upon entering Apartment 14F, the defendants ordered each person in the residence to exit the various rooms of the apartment and wait in the living room.

20. Plaintiffs exited the room they had been in, and waited in the living room.

21. The defendants searched each of the people present in Apartment 14F, including strip searches of the plaintiffs.

22. The defendants searched each room of Apartment 14F.

23. Plaintiffs were detained for the duration of the search of Apartment 14F.

24. Defendants later reported that they discovered a firearm inside the bottom drawer of a dresser within Furman Massey's room during their search of the residence. No contraband was located anywhere else inside the apartment.

25. Plaintiffs Jarvis Roberts, Gregory Roberts, and Kendall Massey, as well as non-party Furman Massey were arrested in conjunction with the firearm discovered in Furman Massey's room.

26. None of the three plaintiffs were inside Furman Massey's room at any point between the police officers entrance into the apartment and their eventual arrest.

27. None of the three plaintiffs resided in Furman Massey's room at the time of the incident, nor did the police officers have reason to believe that they resided there.

28. Plaintiffs were processed for arrest and eventually taken to Brooklyn Central Booking to await arraignment.

29. Plaintiff Gregory Roberts was finally released from custody after the King's County District Attorney's Office declined to prosecute him.

30. Plaintiffs Jarvis Roberts and Kendall Massey were each arraigned and charged with criminal possession of a weapon. The charges brought against them were later dismissed.

31. Upon information and belief, Furman Massey gave statements indicating the firearm was his immediately after its discovery, denied any other occupant of the apartment was responsible for the firearm, and ultimately entered a plea of guilty to possessing the firearm.

32. Defendants lacked probable cause or reasonable suspicion to believe plaintiffs had been involved in any illegal activity.

33. At all times during the events described above, the defendant police officers were engaged in a joint venture and formed an agreement to violate plaintiff's rights. The individual

officers assisted each other in performing the various actions described and lent their physical presence and support and the authority of their office to each other during said events. They failed to intervene in the obviously illegal actions of their fellow officers against plaintiff.

34. During all of the events above described, defendants acted maliciously and with intent to injure plaintiff.

## DAMAGES

35. As a direct and proximate result of the acts of defendants, plaintiffs suffered the following injuries and damages:

    a. Violation of their rights pursuant to the Fourth and Fourteenth Amendments to the United States Constitution to be free from an unreasonable search and seizure;

    b. Violation of their rights to Due Process of Law under the Fourteenth Amendments to the United Stated Constitution;

    c. Emotional trauma and suffering, including fear, embarrassment, humiliation, emotional distress, frustration, extreme inconvenience, anxiety;

    d. Loss of liberty;

    e. Economic loss.

## FIRST CAUSE OF ACTION
(42 U.S.C. § 1983 – as to Individual Defendants)

36. The above paragraphs are here incorporated by reference.

37. Defendants have deprived plaintiffs of their civil, constitutional and statutory rights under color of law and have conspired to deprive them of such rights and are liable to plaintiffs under 42 USC § 1983.

38. Defendants' conduct deprived plaintiffs of their right to be free of unreasonable searches and seizures, pursuant to the Fourth and Fourteenth Amendments to the United States

5

Constitution. Defendants' conduct also deprived plaintiff of his right to due process of law, pursuant to the Fourteenth Amendment of the United States Constitution.

39. Defendants falsely arrested plaintiffs and maliciously prosecuted them, presented knowingly false information to prosecutors, and failed to intervene in each other's obviously illegal actions.

40. Plaintiffs have been damaged as a result of defendants' wrongful acts.

## SECOND CAUSE OF ACTION
(42 U.S.C. § 1983 – Municipal And Supervisory Liability as to Defendant City of New York)

41. The above paragraphs are here incorporated by reference.

42. The City is liable for the damages suffered by Plaintiff as a result of the conduct of its employees, agents, and servants, in that: after learning of its employees' violation of Plaintiffs' constitutional rights, the City failed to remedy the wrong; it has created a policy or custom under which unconstitutional practices occurred and allowed such policies or customs to continue; and it has been grossly negligent in managing subordinates who caused the unlawful condition or event. The City has been alerted to the regular use of excessive force and false arrests by its police officers, but has nevertheless exhibited deliberate indifference to such excessive force and false arrests; that deliberate indifference caused the violation of Plaintiff's constitutional rights in this case.

43. The City knew of, or had reason to know that Defendant Azize was likely to violate the rights of persons such as Plaintiff. Upon information and belief, the City was aware that defendant Azize has previously violated the rights of individuals as a result of lawsuits filed against defendant Azize such as *Jackson v. City of New York, et al.*, *15 CV 4109* (alleging false arrest by Officer Azize including claims that he brought false charges for possession of a firearm), and *King v. City of New York, et al.*, *16 CV 0306* (same). These cases should have

alerted the City to Officer Azize's propensity for violating the rights of individuals.

44. The City's continuing failure to deter police misconduct has led to an increase in the number of lawsuits for repeat routine misconduct by the same officers, same units, and same precincts.

45. The number of claims against the NYPD doubled between 2004 and 2014, to a record high of 9,570 lawsuits filed in 2012. The suits cost taxpayers more than $1 billion dollars during that time period.[1]

46. From 2009-2014, New York City paid out more nearly $500 million to settle NYPD-related cases.[2] In fiscal year 2012, so-called "police action claims," which are claims that result from false arrest or imprisonment, police shootings, excessive use of force, assault, or failure to protect, cost the City $64.4 million.[3] In fiscal year 2011, the City paid $60.2 million in police action claims.[4] Despite nominal attempts at reform, by fiscal year 2016, the City's payments for police misconduct lawsuits have increased to $228 million.[5]

*47.* The widely held assumption is that civil rights lawsuits deter police misconduct. "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive

---

[1] Barry Paddock, Rocco Parascandola, John Marzulli, & Dareh Gregorian, *Exclusive: Detective is NYPD's most-sued cop, with 28 lawsuits filed against him since 2006*, N.Y. DAILY NEWS, Feb. 16, 2014, http://www.nydailynews.com/new-york/lawsuits-nypd-double-decade-costing-taxpayers-1b-article-1.1615919#ixzz2ttdX4ZkE; *see also* Colleen Long & Jennifer Peltz, Associated Press, *Nearly $1B in NYC police payouts*, Yahoo! News (October 14, 2010, 7:44 PM), http://news.yahoo.com/ap-investigation-nearly-1b-nyc-police-payouts.html (reporting that, in the decade ending in 2010, the City paid out nearly one billion dollars to resolve claims against the NYPD).

[2] Caroline Bankoff, *The City Has Paid Almost Half a Billion Dollars in NYPD-Related Settlements Over the Past 5 Years*, NYMag.com, Oct. 12, 2014, http://nymag.com/daily/intelligencer/2014/10/428-million-in-nypd-related-settlements-paid.html.

[3] City of New York, Office of the Comptroller Claims Report FY 2012, 30, June 4, 2013, https://www.documentcloud.org/documents/1375759-fy-2012-claims-report.html.

[4] *Id*.

[5] NYC Paid $228 Million For Police Misconduct In The Last Fiscal Year, September 21, 2016, http://gothamist.com/2016/09/21/nypd_misconduct_costs.php?utm_source=feedly&utm_medium=webfeeds

individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161, (1992) (citing *Carey v. Piphus,* 435 U.S. 247, 254-257, (1978)). "As far as we know, civil liability is an effective deterrent [to civil rights violations], as we have assumed it is in other contexts." *Hudson v. Michigan*, 547 U.S. 586, 598 (2006) (citing *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 70 (2001) and *Nix v. Williams,* 467 U.S. 431, 446, (1984)).

48. However, the City of New York has isolated NYPD officers from accountability for civil rights lawsuits by routinely indemnifying officers who violate the constitutional rights of citizens against all liability. The result is that civil rights lawsuits have no deterrent value to the City, the NYPD, or NYPD officers. "It is almost axiomatic that the threat of damages has a deterrent effect, surely particularly so when the individual official faces personal financial liability." *Carlson v. Green*, 446 U.S. 14, 21, (1980) (citing *Imbler v. Pachtman*, 424 U.S. 409, 442 (1976)) [footnote omitted].

49. Civil rights lawsuits against police officers have no impact on the officers' careers, regardless of the expense to the City of the officers' lawsuit liability, even when the same officers are named in numerous lawsuits. In 1999, then-Comptroller Alan Hevesi reported that there was a "total disconnect" between the settlements of even substantial civil claims and NYPD action against officers. That total disconnect has remained fully in place since 1999. The result is a system in which the City pays vast sums of money to settle claims of constitutional violations, but the NYPD does nothing to investigate or address the underlying causes of such violations.

50. Additionally, according to a report of the New York City Bar Association issued in 2000, the City has isolated the Law Department from the discipline of police officers. Civil

8

rights lawsuits against police officers have no impact on the officers' careers, regardless of the officers' lawsuit liability, even after multiple lawsuits.

51. At a City Council hearing on December 12, 2009, and on other occasions, the City Council, Government Operations Committee has been alerted to the obvious problem of officers and precincts with a disproportionate responsibility for civil rights lawsuit liability. Nonetheless, the City Council has failed to take action to hold officers or precincts accountable. It has likewise failed to hold an investigative hearing into what extent specific officers, units, and precincts are disproportionately responsible for New York City civil rights lawsuits.

52. The event underlying Plaintiffs' factual allegations was not an isolated incident. The City has been aware for some time, from lawsuits, Notices of Claim, complaints filed with the Civilian Complaint Review Board ("CCRB"), City Council hearings, newspaper reports, cases resulting in declined prosecutions and dismissals, and judicial rulings suppressing evidence and finding officers incredible as a matter of law, that a disturbing number of NYPD officers unlawfully search and seize citizens, bring charges against citizens with no legal basis, perjure themselves in charging instruments and testimony, and fail to intervene in and report the obviously illegal actions of their fellow officers. Nevertheless, the City has allowed policies and practices that allow the aforementioned to persist.

53. Moreover, the City has repeatedly resisted attempts to catalog even basic information gleaned from civil rights lawsuits that could improve training, leadership, supervision, and discipline in the NYPD. The City's deliberate indifference towards the contents of civil rights litigation, individual officers repeatedly named in lawsuits, incidents repeatedly occurring in the same precinct, and patterns of misconduct that arise in civil rights litigation has caused the constitutional violations against Plaintiffs.

54. The City has purported to attempt to address police officers' abuse of authority, in part through the creation of the CCRB. However, the CCRB has proved vastly inadequate for that purpose.

55. The CCRB, a City police oversight agency, often finds complainants lack credibility based in part on the fact that such complainants have also brought lawsuits to remedy the wrongs they have experienced, a practice that often results in not substantiating the most serious charges brought to the CCRB. In addition, the CCRB virtually never initiates their own findings of false statements against officers who have made false statements to the CCRB in their own defense, nor do they initiate findings that officers have failed to report their fellow officers' misconduct; thus, officers have no real incentive to come forward, or to testify truthfully at the CCRB. The CCRB has no enforcement mechanisms once making a finding against an officer; it can only make recommendations to the NYPD upon finding misconduct by an officer.

56. The NYPD, once receiving a substantiated complaint by the CCRB, routinely fails to adequately discipline officers for misconduct. Even as focus on police misconduct has increased in recent years, and new leadership has promised sweeping operational changes, the NYPD still routinely fails to discipline its officers. According to a study conducted by the WNYC, in 2012, police officers received no discipline in 104 cases (40.3%) of the substantiated complaints processed (258).[6] In 2013, the NYPD dropped 28.3% of the substantiated complaints without any disciplinary action.[7] In 2014, it dropped 24.5%.[8]

57. Due to the continuing failures of the CCRB, many abuses of authority by police officers go unreported. Even when abuse is reported, police officers rarely, if ever, are disciplined. This

---

[6] WNYC, *Police Punishment: CCRB vs NYPD*, http://project.wnyc.org/ccrb/ (last visited July 23, 2015).

[7] *Id*.

[8] *Id*.

pattern is well-known to NYPD officers; as a result, officers feel free to abuse their authority with little or no fear of repercussions. Such lack of accountability has permitted, and even encouraged, frequent and widespread violations of the civil rights of individuals at the hands of NYPD officers. Furthermore, the lack of accountability contributed to the defendant police officers' actions described above in that the officer defendants felt insulated from any repercussions for their actions regarding the Plaintiff.

58. The NYPD Department Advocate, which is endowed with the responsibility of following up on substantiated CCRB charges, is understaffed and under-utilized. Furthermore, in the extraordinarily rare event that the CCRB substantiates a complaint and the Department Advocate proves the case in an internal trial against an officer, the police commissioner still maintains the power to reduce the discipline against such an officer, which the police commissioner has done on many occasions. This entire procedure provides so many opportunities for meritorious complaints of false arrests to be dismissed or disregarded that there is no credible, effective oversight of police department employees, despite an apparently elaborate set of oversight mechanisms.

59. The City has also been alerted to the regular use of stop and frisks by its police officers, which disproportionately target people of color, despite the of lack criminal evidence that such stop and frisks actually produce, and despite the humiliation, inconvenience, and constitutional violations that the majority of law-abiding people, mostly in communities of color, suffer as a result.

60. Even as the use of stop and frisk has declined precipitously in recent years – in large part due to the federal class action lawsuit *Floyd, et al. v. City of New York, et al*., 08-CV-1034 (SAS) – the police have continued to use the policing tactic in a severely racially

disproportionate manner, and for the improper purpose of meeting "performance goals" (arrest quotas). According to data collected by the New York Civil Liberties Union ("NYCLU"), in 2014, New Yorkers were stopped by the police 46,235 times. Of the people stopped: 38,051 were totally innocent of any crime (82%); 24,777 were Black (55%); 12,662 were Latino (29%); and 5,536 were white (12%).[9]

61. The City is also aware that the misconduct does not stop at the regular use of stop and frisks to violate the civil rights of innocent people. For example, the NYCLU reported that more than 85% of summonses for Open Container were given to Black and Latino New Yorkers, whereas white recipients made up merely 4%.[10] The grossly disproportionate issuance of summonses to New Yorkers of color led one Kings County judge to note that he could not recall ever having arraigned a white defendant on an open container charge.[11] Police officers have repeatedly told New York City news investigations that their supervisors pressure them into reaching "performance goals" or arrest quotas, resulting in the violation of innocent New Yorker's civil rights.[12]

62. The City's inability to prevent its officers from abusing the stop and frisk policy are emblematic of the City's continuing failures to exercise adequate control over the NYPD, and to prevent police officers from abusing their authority. Such failures have led to further abuse of

---

[9] *See* NYCLU, *Stop and Frisk Campaign: About the Issue*, http://www.nyclu.org/content/stop-and-frisk-data (last visited July 22, 2015).

[10] See NYCLU, *Testimony Before City Council Public Safety & Courts and Legal Services Committees On Summons Court Operations and Impact*, http://www.nyclu.org/content/testimony-city-council-public-safety-courts-and-legal-services-committees-summons-court-oper.

[11] *People v. Figueroa*, 36 Misc.3d 605, 608 (Kings Co. 2012).

[12] *See* Jim Hoffer, *NYPD Officer Claims Pressure to Make Arrests*, WABC News ( (Mar. 2, 2010, 10:37 PM), http://7online.com/archive/7305356/ and Jim Hoffer, *Kelly Responds to Our NYPD Quotas,* WABC News (May 25, 2010, 3:31 PM), http://7online.com/archive/7461355/.

authority by police officers, including the incident underlying Plaintiff's Complaint.

63. Further, the City has no procedure to notify individual officers or their supervisors of unfavorable judicial review of their conduct or to calculate the total liability of an individual officer or of a precinct. Without this notification, improper search and seizure practices and incredible testimony go uncorrected, problematic supervision or leadership at the precinct level goes ignored, and repeated misconduct by individual officers goes unaccounted for. Even occasional judicial findings that officers have testified incredibly are not reported routinely to the police department or any oversight agencies.

64. All of the aforementioned has created a climate where police officers and detectives lie to prosecutors and in police paperwork and charging instruments, and testify falsely, with no fear of reprisal. As the Honorable Jack Weinstein, United States District Court Judge of the Eastern District of New York, has written:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration—through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department— there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

*Colon v. City of New York*, No. 09-CV-8, 2009 WL 4263362, at *2 (E.D.N.Y. Nov. 25, 2009).

65. The City is aware that all of the aforementioned has resulted in violations of citizens' constitutional rights. Despite such notice, the City has failed to take corrective action. This failure and these policies caused the officers in the present case to violate Plaintiff's civil rights, without fear of reprisal.

66. Plaintiffs have been damaged as a result of the deliberate indifference of the Defendant City.

WHEREFORE, plaintiffs demand judgments against the defendants, jointly and severally, as follows:

    A.    In favor of plaintiffs in an amount to be determined by a jury for each of plaintiffs' causes of action;

    B.    Awarding plaintiffs punitive damages in an amount to be determined by a jury;

    C.    Awarding plaintiffs reasonable attorneys' fees, costs and disbursements of this action; and

    D.    Granting such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:    September 28, 2016
                Brooklyn, New York

Respectfully yours,

*/s/ Nicholas Mindicino/*

By: Nicholas Mindicino, Esq.
Stoll, Glickman & Bellina, LLP
Attorneys for Plaintiff
475 Atlantic Avenue, 3rd Floor
Brooklyn, NY  11217
(718) 852-3710
(718) 852-3586
NMindicino@stollglickman.com

TO:    City of New York
        Corporation Counsel Office
        100 Church Street
        New York, NY  10007

        Officer George Azize, Shield No. 16004
        NYPD – 73rd Precinct
        1470 East New York Avenue
        Brooklyn, NY, 11212

        Officer Theodore Peters, Shield No. 13285
        NYPD-Housing Bureau PSA2
        560 Sutter Avenue Brooklyn, NY 11207