UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
JARVIS ROBERTS, GREGORY ROBERTS, and
KENDALL MASSEY,

                                    Plaintiff,

                      -against-

THE CITY OF NEW YORK, POLICE OFFICER
GEORGE AZIZE, SHIELD NO. 16004, POLICE
OFFICER THEODORE PETERS, SHIELD NO. 13285,
JOHN DOE #1-4.

                                  Defendants.

-------------------------------------------------------------------X

16-cv-5409 (BMC)

**MEMORANDUM OF LAW
IN OPPOSITION TO
DEFENDANTS' MOTION
FOR SUMMARY
JUDGMENT**


***ORAL ARGUMENT
REQUESTED***


Nicholas Mindicino
**Stoll, Glickman & Bellina, LLP**
Attorneys for Plaintiff
475 Atlantic Avenue, 3rd Floor
Brooklyn, NY 11217
(718) 852-3710
NMindicino@stollglickman.com

## TABLE OF CONTENTS

Table Of Authorities…………………………………………………………………  iii

Plaintiff's Counter-Statement Of Facts…………………………………………  1

Argument……………………………………………………………………………..  8

I. Standard Of Review………………………………………………………………..  8

II. Plaintiff's Claims For False Arrest Must Be Decided A Jury…………………….  8

III. Plaintiffs Jarvis Roberts' And Kendall Massey's Claims For Malicious
Prosecution Against Officer Azize Must Be Decided By A Jury……………………  18

    A.  Defendant Azize Initiated The Prosecution Of The Plaintiff……………..  19

    B.  There Was No Probable Cause For The Prosecution Of Plaintiff…………..  20

    C.  Plaintiffs Suffered Sufficient Post Arraignment Deprivation Of Liberty To
       State A Claim…………………………………………………………………...  21

IV. Plaintiffs' Fair Trial Claims Must Be Decided By A Jury………………………  21

V. The Defendants Are Not Entitled To Qualified Immunity……………………….  23

VI. Decision On Plaintiffs' Failure To Intervene Claims Should Be Reserved Until
Time Of Trial…………………………………………………………………………...  25

VII. The Municiple Liability Claim Has Been Severed By The Court……………...  25

Conclusion……………………………………………………………………………...  25

# TABLE OF AUTHORITIES

*Allen v. City of New York*, 480 F. Supp. 2d 689 (S.D.N.Y. 2007)……………………………… 19

*Beard v. Banks*, 548 U.S. 521 (2006)……………………………………………………… 8

*Betts v. Shearman*, 12-CV-3195(JPO), 2013 WL 311124 (S.D.N.Y. Jan. 24, 2013), aff'd,
751 F.3d 78 (2d Cir. 2014)…………………………………………………………………… 22

*Boyd v. City of N.Y.*, 336 F.3d 72 (2d Cir. 2003)………………………………………… 20

*Brown v. Henderson*, 257 F.2d 246 (2d Cir.2001)……………………………………… 8

*Caldarola v. Calabrese*, 298 F.3d 156 (2d Cir. 2002)………………………………….. 17

*Cameron v. City of New York*, 598 F.3d 50 (2d Cir. 2010)……………………………… 19

*Cammick v. City of N.Y.*, 96-CV-4374 (RPP), 1998 WL 796452 (S.D.N.Y. Nov. 17,
1998)………………………………………………………………………………………… 11

*Caraballo v. City of N.Y.*, 10-CV-1885(SJR)(ML), 2012 WL 12883307 (E.D.N.Y. June
26, 2012), aff'd, 526 F. App'x 129 (2d Cir. 2013)…………………………………………… 14

*Caraballo v. City of N.Y.*, 526 F. App'x 129 (2d Cir. 2013)……………………………… 14

*Cooper v. City of New Rochelle*, 925 F. Supp. 2d 588 (S.D.N.Y. 2013)…………………. 16

*Davis v. City of N.Y.*, 04-CV-3299 (JFB)(RLM), 2007 WL 755190 (E.D.N.Y. Feb. 15,
2007)………………………………………………………………………………………… 12

*Devenpeck v. Alford*, 543 U.S. 146 (2004)…………………………………………………. 15

*Dinler v. City of New York*, 04-CV-7921(RJS)(JCF), 2012 WL 4513352 (S.D.N.Y. Sept.
30, 2012)…………………………………………………………………………………….. 9

*Faruki v. City of N.Y.*, 517 F. App'x 1 (2d Cir. 2013)………………………………….. 21

*Florida v. J.L.*, 529 U.S. 266 (2000)……………………………………………………… 17

*Gannon v. City of N.Y.*, 917 F. Supp. 2d 241 (S.D.N.Y. 2013)………………………… 20

*Garnett v. Undercover Officer C0039*, 13-CV-7083 (GHW), 2015 WL 1539044
(S.D.N.Y. Apr. 6, 2015)……………………………………………………………………… 22

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982)……………………………………………… 23

*Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir.2006)……………………………………… 8

*Jocks v. Tavernier*, 316 F.3d 128, 136 (2d Cir. 2003)…………………………………… 18

*Jones v. City of N.Y.*, 13-CV-0703(BMC), 2014 WL 1427855 (E.D.N.Y. Apr. 14, 2014).. 11

*Knox v. Cnty. of Putnam*, 10-CV-1671(ER), 2012 WL 4462011 (S.D.N.Y. Sept. 27,
2012)………………………………………………………………………………………… 24

*Lennon v. Miller*, 66 F.3d 416 (2d Cir. 1995)…………………………………………... 23

*Levy v. City of New York*, 935 F. Supp. 2d 575 (E.D.N.Y. 2013)………………………… 19

*Long v. N.Y. City*, 14-CV-9908 (VEC), 2016 WL 4203545 (S.D.N.Y. Aug. 8, 2016)……. 22

*Marom v. City of New York*, 15-CV-2017(PKC), 2016 WL 916424 (S.D.N.Y. Mar. 7,
2016)………………………………………………………………………………………… 22

*Maryland v. Pringle*, 540 U.S. 366 (2003)……………………………………………….. 9

*McColley v. Cty. of Rensselaer*, 740 F.3d 817 (2d Cir. 2014)…………………………… 24

*Michigan v. DeFillippo*, 443 U.S. 31 (1979)……………………………………………… 9

*Minter v. Cty. of Westchester*, 08-CV-7726 (WHP), 2011 WL 856269 (S.D.N.Y. Jan. 20,
2011)………………………………………………………………………………………… 12

*Miyares v. City of N.Y.*, 11-CV- 4297(RJS), 2013 WL 3940816 (S.D.N.Y. July 31, 2013). 12

*Pearson v. Callahan*, 555 U.S. 223 (2009)………………………………………………... 23

*Penree v. City of Utica, N.Y.*, 13-CV-01323(MAD)(ATB), 2016 WL 915252 (N.D.N.Y.

Mar. 4, 2016), *aff'd in part, appeal dismissed in part sub nom. Penree by Penree v. City of Utica, N.Y.*, No. 16-828-CV, 2017 WL 2332535 (2d Cir. May 30, 2017)…………… 20

*Perez v. Duran*, 962 F. Supp. 2d 533 (S.D.N.Y. 2013)……………………………………… 21-22

*People v. Bailey*, 159 A.D.2d 1009 (1990)………………………………………………….. 11

*People v. Brown*, 133 A.D.3d 772 (N.Y. App. Div. 2015), *leave to appeal denied*, 26 N.Y.3d 1143 (2016)……………… 11

*People v. Darden*, 34 N.Y.2d 177 (1974)…………………………………………………… 15

*People v. DeJesus*, 44 A.D.3d 464 (2007)…………………………………………………… 11

*People v. Edwards*, 206 A.D.2d 597 (1994)………………………………………………… 10

*People v. Manini*, 79 N.Y.2d 561 (1992)…………………………………………………… 9

*People v Olivo*, 120 AD2d 466 (1986)……………………………………………………… 10

*People v. Patel*, 132 A.D.2d 498 (1987)…………………………………………………….. 11

*People v. Robinson,* 28 Misc. 3d 1051 (Crim. Ct. 2010)…………………………………… 11

*People v Skyles*, 266 AD2d 321 (1999)……………………………………………………… 10

*People v. Vastola*, 70 A.D.2d 918 (1979)…………………………………………………… 10

*Posr v. Court Officer Shield No. 207*, 180 F.3d 409 (2d Cir. 1999)……………………… 20

*Ricciuti v. NYC Transit Authority*, 124 F.3d 123 (2d Cir. 1997)………………………… 9

*Richards v. City of New York*, 97-CV-7990, 2003 WL 21036365 (S.D.N.Y. May 7, 2003) 16

*Savino v. City of New York*, 331 F.3d 63 (2d Cir. 2003)…………………………………… 8, 18

*Saucier v. Katz*, 533 U.S. 194 (2001)………………………………………………………… 23

*Soomro v. City of N.Y.*, 174 F.Supp.3d 806 (S.D.N.Y. 2016)……………………………… 23

*United States v. Colon*, 250 F.3d 130 (2d Cir. 2001)……………………………………… 16

*United States v. Gagnon*, 373 F.3d 230 (2d Cir. 2004)…………………………………… 17

*United States v. Heath*, 455 F.3d 52 (2d Cir. 2006)………………………………………… 11-12

*United States v. Morales*, 851 F. Supp. 112 (S.D.N.Y. 1994)……………………………… 11

*United States v. Rios*, 856 F.2d 493 (2d Cir. 1988)………………………………………… 9

*United States v. Rodriguez*, 392 F.3d 539 (2d Cir.2004)…………………………………… 9

*United States v. Traylor*, 396 F. App'x 725 (2d Cir. 2010)……………………………… 24

*Weaver v. Brenner*, 40 F.3d 527 (2d Cir. 1994)…………………………………………… 23

*White v. Frank*, 855 F.2d 956 (2d Cir.1988)………………………………………………… 19

*Williams v. Atl. City Dep't of Police*, 08-CV-4900 (JBS)(AMD), 2010 WL 2265215 (D.N.J. June 2, 2010)……………… 12, 24

*Ybarra v. Illinois*, 444 U.S. 85 (1979)……………………………………………………... 9

*Zahrey v. Coffey*, 221 F.3d 342 (2d Cir.2000)……………………………………………… 19

The plaintiffs, Jarvis Roberts, Gregory Roberts, and Kendall Massey, by their attorney, Stoll Glickman and Bellina, LLP, submit the following memorandum of law in opposition to Defendants' motion for summary judgment. On February 1, 2014 the plaintiffs were visitors to the home of their family. On that day, the defendant police officers discovered a firearm concealed in a dresser drawer in the bedroom belonging to non-party Furman Massey. None of the plaintiffs were in the room in which the firearm was discovered, nor did plaintiffs demonstrate any knowledge or awareness of the firearm, let alone possession of it. Nevertheless the defendants fabricated a story in which they claimed that plaintiffs were in the room where the firearm was discovered. Because defendants have continued to press their fabricated claims, the essential factual question of whether the plaintiffs possessed the firearm remains in dispute and must be decided by a jury. Nevertheless, defendants now seek summary judgment. Their motion must be denied as essential questions of fact remain.

## PLAINTIFF'S COUNTER-STATEMENT OF FACTS

Apartment 14F at 315 Sutter Ave was the home of plaintiffs' grandmother for many years until she recently moved away, though various other members of the plaintiffs' family have lived in that apartment over the years.. See Ex. 2, ¶3 and 3, ¶3.[1] *Id*. Apt 14F is a 4 bedroom apartment. See Ex. 1, Ex. 2, ¶3 and Ex. 3, ¶3. The floorplan included as Ex. 1 shows the approximate positions of the rooms in the apartment, and labels each bedroom by number.[2] *Id*. Most relevant, bedroom 2 belonged to Furman Massey (brother to Kendall Massey and cousin to the Gregory Roberts and Jarvis Roberts), and plaintiffs' cousin James. See Ex. 2, ¶5 and Ex. 3, ¶ 5.

---

[1] All references to exhibits annexed to the Declaration of Nicholas Mindicino are referred to simply by "Ex". and the correct number. References to exhibits annexed to defendants' motion in the Decalration of Hannah Faddis are referred to as "Def's Ex." and the correct letter.
[2] Plaintiffs have prepared Ex. 1 to the Mindicino Declaration as a demonstrative exhibit in support of their opposition to defendants' motion for summary judgment. See Ex. 1.  The floorplan reasonably approximates the layout of the apartment and is offered to clarify the otherwise confusing layout for the Court.

None of the plaintiffs lived in Apt 14F on the date of the incident. Ex. 2, ¶6, Ex. 3, ¶6, Def's Ex.C at 13:10-16.  Jarvis Roberts and Gregory Roberts had lived there years before the incident, while Kendall Massey never lived there. *Id*. While the plaintiffs visited their family in Apartment 14F frequently, none of them spent the night in the apartment other than on rare unusual occasions such as major holidays or when their grandmother was ill. Ex. 2, ¶6, Ex. 3, ¶6, Def's Ex.C at 18:12-19. None of the plaintiffs had keys to Apartment 14F. Ex. 2, ¶6, Ex. 3, ¶6. Most of the individual bedrooms, including bedroom 2, has individual locks and none of the plaintiffs had keys to any of the bedrooms on February 1, 2014.  *Id*.

<u>February 1, 2014 Prior to Police Involvement</u>

The plaintiffs planned to meet at Apartment 14F on February 1, 2014 to watch a basketball game together with their cousin Dalik. Ex. 2, ¶7, Ex. 3, ¶7. Gregory Roberts entered the apartment at approximately 7:00 to 7:30 pm. Def's Ex.C at 24:12-14. He was in the living room for most of his time in the apartment, but may have entered the kitchen or bathroom.  *Id*. at 28:1-4. He did not enter any of the bedrooms that night. *Id*. For most of his time that night he sat in a chair in the living room, directly adjacent to the kitchen. *Id*. at 28:7-18.

Kendall Massey entered the apartment at approximately 8:00 to 9:00 pm. Ex. 3, ¶7. He said hello to his family members, learned his cousin Dalik was in bedroom 4 and went to that area of the apartment. *Id*. Kendall passed by his brother Furman's room on the way to bedroom 4. *Id*. He briefly opened the door and waived hello to his brother from the hallway, but didn't enter the room. *Id*. He then proceeded to bedroom 4. *Id*.

Jarvis Roberts arrived between 8:00 and 9:00 pm. Ex. 2, ¶8. He stopped in the living room and spoke with family members. *Id*. He then went to bedroom 4 joining Kendall Massey and their cousin Dalik. *Id*. He never entered bedroom 2 on February 1, 2014. *Id*.

2

<u>The Supposed Tip Regarding Apartment 14F</u>

Officer George Azize represents that he and Officer Peters were present for a meeting between Sgt. Turner, a "Field Intelligence Officer" and a "Field Intelligence Sergeant." Def's Ex. 5, at 38:18–43:19. This meeting consisted of the Field Intelligence Officer speaking to Sgt. Turner specifically, though Officer Azize was present. *Id*. at 41:2-3. Officer Azize has no recollection of who the Field Intelligence Officer or Sergeant were, nor did he record these people's identity in any way. *Id*. at 40:2-5, 42:16–43:6. According to Azize, the Field Intelligence Sergeant told Sgt. Turner certain information regarding Jarvis Roberts possessing a firearm in Apt 14F.  *Id*. at 45:21–46:2.  He believes that information came from a confidential informant ("CI"), but did not recall anything about the CI. *Id*. at 46:16-18. Officer Azize did not know anything about the CI's track record for giving information in the past. *Id*. at 56:12-24.

Sgt. Thomas Turner did not recall having this meeting with the Field Intelligence Officer and Sergeant. He testified that he was unaware of any role a CI played in conveying the tip. Def's Ex. F at 19:11-17. Instead he represents that the "tip" regarding Jarvis Roberts was conveyed to him by Officer Peters, and Sgt. Turner was unaware of the source of Peters' information.  *Id*. at 19:18 – 20:12.  He does believe he had a meeting with his team at PSA-2 regarding this information at approximately 9:00 pm. *Id*. at 25:21-23. He does not recall anything about that meeting including who was present or what was discussed. *Id*. at 25:24 – 26:10.

Officer Theodore Peters believes that he learned the information about Apartment 14F from a Field Intelligence Sergeant. Def's Ex. E at 26:24–27:15. He did not recall how the information was communicated to him on February 1, 2014, but testified that it typically involved phone communications. *Id*. at 27:16-25.

3

None of the officers recorded the contents of the supposed tip in their memo books, the arrest reports, or any complaint follow-up (A.K.A. "DD5") reports.[3] See Ex. 6-8, Def's Ex. J-L. Neither the existence of an informant nor the contents of the tip were conveyed to the Assistant District Attorney assigned to the cases. Ex. 4. There is no evidence that any recording of these tips was made by any Field Intelligence Officer or Sergeant, nor have the relevant Field Intelligence officers been identified through discovery. Per Section 202-41 of the New York Police Department Patrol Guide, a field intelligence officer is required to "enter intelligence from any source into" one of two databases, and to "document intelligence forwarded to investigative and enforcement units." Ex. 5. There is no record that such entries or documentation exist in this matter. There is no evidence as to who gave this supposed tip, whether the tipster was a "registered" CI, the circumstances under which it was given, to whom it was given, or how or to whom it was conveyed by the original tipster. Similarly there is no evidence as to who specifically conveyed the "tip" to the defendants, or how many people the information passed between before supposedly reaching the defendants.

## Police Entrance and Search

On February 1, 2014 Sgt. Turner's team came to Apartment 14F. Def's Ex. D at 58:14-25.  The team included defendants Azize and Peters as well as the Sgt. and 2-3 other unknown officers. *Id.* at 59:14-16.  The officers knocked on the door to Apartment 14F shortly after 10:00 pm. Ex. 6-8. Willie Roberts answered the door. Def's Ex. G at 14:9-16.  The officers claimed to have a warrant for a man who previously lived next door in Apartment 14E and requested to look

---

[3] A DD5, or "complaint follow-up report is a form document on which a police officer reports additional information concerning a previously recorded complaint … Sections of the report are devoted to such purely factual data as: the names, addresses, and physical descriptions of crime victims, witnesses, and perpetrators; a checklist that indicates whether the victims and witnesses have been interviewed and shown photos, whether crime scenes have been photographed and dusted for fingerprints, and whether neighborhood residents have been canvassed for information; and a blank space denominated "details" in which the officer records the particulars of any action taken in connection with the investigation." *Gould v. N.Y. City Police Dep't*, 89 N.Y.2d 267, 277, 675 (1996).

for him. *Id*. at 14:11 – 15:6. Willie Roberts agreed. *Id*.  The officers entered the apartment and Azize, Peters and Turner proceeded down the hallway.  Def's Ex. D at 68: 19-22.

When the officers entered the apartment Gregory Roberts was seated in a chair in the living room, directly adjacent to the kitchen. Def's Ex. C at 29:12-22.  Jarvis Roberts and Kendall Massey were in bedroom 4. Ex. 2, ¶9, Ex. 3, ¶8. After the police officers entered, they escorted all people in the apartment to the living room and kitchen areas, and detained them there while the officers searched the bedrooms. Ex. 2, ¶10, Ex. 3, ¶9. While the plaintiffs were detained in the living room and kitchen, the defendants began asking who stayed in each room. Ex. 2, ¶11, Ex. 3, ¶10. The plaintiffs various family members who lived in the apartment indicated which rooms they each stayed in. *Id*. None of the plaintiffs reported that they stayed in any of the rooms because they did not live in the apartment. *Id*.

Officers Azize and Peters searched Furman Massey's bedroom, bedroom 2 of the apartment.[4] Officer Peters testified that he found a gun in a bottom dresser drawer in Furman's bedroom. Def's Ex. E at 37:12-15. The officers could not recall whether the drawer was closed when the entered the apartment, nor could they recall whether the gun was covered or concealed within the drawer. *Id*. at 37:16-20.  However, they did not notice the gun until after clearing the room of non-police and searching for one to two minutes. *Id*. at 37:21–38:2.

The defendants returned to the living room and specifically asked about bedroom 2, asking whose bedroom it was. Ex. 2, ¶12-13, Ex. 3, ¶11-12. Furman and plaintiffs' cousin James identified it as their room. *Id*. When asked, Furman volunteered that it was his dresser. *Id*. The plaintiffs were present during this questioning. *Id*. Furman Massey did not claim that his brother

---

[4] The officers had difficulty recalling the precise layout of the apartment and identifying the specific rooms. However, the descriptions the officers gave the room clearly matches what has been described as bedroom 2, and Furman Massey's statements confirm that conclusion.  See Def's Ex. 32:21 – 34:22; cf. Def's Ex. A at 104:7 – 105:22.

Kendall Massey stayed with him in bedroom 2. *Id*. He did say that his cousin James stayed with him in bedroom 2. *Id*.

After conferencing amongst themselves, the officers directed Jarvis Roberts and Gregory Roberts to stand up to be handcuffed. Ex. 2, ¶14, Ex. 3, ¶13. When plaintiffs questioned why they were being handcuffed, one of the officers claimed to have found a pistol. *Id*. Jarvis Roberts protested his arrest, saying that it was not his gun and he did not live in the apartment. *Id*. The officers responded by asking whose gun it was. Ex. 2, ¶15, Ex. 3, ¶14. At that point Furman Massey volunteered that the gun was his, and confirmed that it had been in his dresser. *Id*. Furman Massey's confession to possessing the firearm was spontaneous. Ex. 2, ¶16, Ex. 3, ¶15. None of the plaintiffs threatened him or promised him anything to make the statement, nor did they do anything which the officers could have interpreted as an attempt to influence him. *Id*. After Furman Massey admitted the gun was his, officers asked Furman who stayed in the room with him. *Id*. He confirmed his cousin James stayed there with him. Furman's admission to possessing the gun was made before anyone had been taken into custody. Ex. 2, ¶17, Ex. 3, ¶16.

The plaintiffs and Furman Massey were arrested shortly after Furman's admission. Ex. 2, ¶18, Ex. 3, ¶17. Officers Azize and Peters personally participated in the arrests of plaintiffs. Def's Ex. E at 39:4-5. Each believed that they had probable cause to arrest plaintiffs for possession the firearm found in the dresser drawer of bedroom 2, based on the officers' claims that all four men who were arrested had been together in bedroom 2 when the officers entered. Def's Ex. D at 82:24 – 83:10. Prior to the arrest, the officers did not know whether any of the four people they arrested lived in the apartment. *Id*. at 76:24-25.

The time of arrest was recorded as 10:45 pm. See Def's Ex. J-L. The four men were taken from the apartment together in handcuffs, transported to the precinct and later transferred

to court to await arraignment. Ex. 2, ¶20, 22, Ex. 3, ¶19, 21. While at the precinct, Furman

Massey gave a written statement confirming his previous oral statement that the gun was his,

adding that the others never knew he had it.  See Def's Ex. P.  At approximately 7:30 pm on

February 2, 2014 Gregory Roberts was released without charges after Assistant District Attorney

("ADA") Anna Tse declined to prosecute him. See Ex. 4.  At approximately 9:00 pm on

February 2, 2014 Jarvis Roberts and Kendall Massey were arraigned on charges of criminal

possession of a weapon, and released on their own recognizance. Ex. 2, ¶23, Ex. 3, ¶22.

<u>The Prosecution of Plaintiffs</u>

Officer Azize was the "arresting officer" for all three plaintiffs. Def's Ex. D at 92:7-8.

As such, he prepared various paperwork related to the arrest. *Id*. at 92:15-17. He also spoke with

the ADA assigned to the preparing criminal court documents. *Id*. at 92:18 – 93:7. In that

conversation he described his version of the events of the night. *Id*. at 95:3-4.  Officer Azize

understood that his communications with the ADA would be used to determine what if any

charges should be brought against the plaintiffs. *Id*. at 95:5-11.

Officer Azize reported to the ADA that all three plaintiffs were together in Furman

Massey's bedroom when the officers arrived. See Ex. 4, Def's Ex. P. He also reported statements

which he claimed were made in 315 Sutter Ave from 10:40 to 10:45 pm.  He claimed that:

-   Furman Massey stated that "It's my room and I share the room with my brother
    Kendall."
-   Jarvis Roberts stated that he stayed in the room where the gun was recovered
    sometimes.
-   Gregory Roberts stated that he was "just hanging out" in the room in which the gun
    was recovered.

See Ex. 4, Def's Ex. P.  Officer Azize does not recall any of the plaintiffs making any statements

about a connection to the gun or the room in which it was found. Def's Ex. D at 83:15-22.  He

specifically could not recall any of the statements which were later reproduced in the CPL

730.10 notice.  *Id.* at 167:2 – 169:2; *cf.* Def's Ex. P. Azize later signed criminal complaints, swearing to similar facts.  Def's Ex. N and O.

Jarvis Roberts and Kendall Massey appeared in criminal court three and four times respectively, inclusive of their arraignments. See Def's Ex. Q and S.  Charges against them were dismissed on August 29, 2014. See Def's Ex. R and T.

## ARGUMENT

### I. STANDARD OF REVIEW.

Federal Rule of Civil Procedure 56 provides that summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Beard v. Banks*, 548 U.S. 521, 529 (2006)(internal quotations omitted). *See also* Fed. R. Civ. P. 56(c). A court must "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing the judgment." *Brown v. Henderson*, 257 F.2d 246, 251 (2d Cir.2001).

### II.    PLAINTIFF'S CLAIMS FOR FALSE ARREST MUST BE DECIDED BY A JURY.

To state a claim for false arrest, a plaintiff must show that 1) the defendant intended to confine the plaintiff, 2) the plaintiff was conscious of confinement, 3) the plaintiff did not consent to the confinement, and 4) the confinement was not otherwise privileged. *Savino v. City of New York*, 331 F.3d 63, 75 (2d Cir. 2003). "Under New York law, the existence of probable cause is an absolute defense to a false arrest claim." *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir.2006). Defendants do not dispute the first three elements, but do claim that the arrest was privileged because defendants had probable cause to arrest.

For probable cause to exist, the "facts and circumstances within the officer's knowledge must be sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979). "The substance of all the definitions of probable cause is a reasonable ground for belief of guilt, and that belief of guilt must be particularized with respect to the person to be searched or seized." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). In determining whether there was probable cause to make the arrest, "the court must consider the facts available to the officer at the time of the arrest." *Ricciuti v. NYC Transit Authority*, 124 F.3d 123, 128 (2d Cir. 1997).

Defendants do not contend that plaintiffs actually possessed any contraband. Accordingly, any claim of probable cause must be established by "constructive possession" of the firearm recovered from Furman Massey's bedroom.  "Mere presence at the location of contraband does not establish possession. … What is required is sufficient indicia of dominion and control." *United States v. Rios*, 856 F.2d 493, 496 (2d Cir. 1988)( citations omitted); *see also Dinler v. City of New York*, 04-CV-7921(RJS)(JCF), 2012 WL 4513352 (S.D.N.Y. Sept. 30, 2012).  "[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979). "Mere presence at the location of contraband does not establish possession." *United States v. Rodriguez*, 392 F.3d 539, 548 (2d Cir.2004).

"In New York, the rule has long been that to support a charge that a defendant was in constructive possession of tangible property, the People must show that the defendant exercised 'dominion or control' over the property by a sufficient level of control over the area in which the contraband is found or over the person from whom the contraband is seized." *People v. Manini*,

79 N.Y.2d 561, 573 (1992). "Constructive possession may be established by direct evidence or by circumstantial evidence with inferences drawn from the facts presented in the case." *People v Skyles*, 266 AD2d 321, 322 (1999).   However, when relying "wholly upon circumstantial evidence to establish the guilt of the accused, the circumstances must be satisfactorily established and must be of such a character as, if true, to exclude to a moral certainty every other hypothesis except that of the accused's guilt." *People v Olivo*, 120 AD2d 466, 467 (1986).

"Where a gun is found in an area occupied by several people and where no one individual could be said to have dominion and control of the weapon, the People have a heavy burden in establishing constructive possession." *People v. Vastola*, 70 A.D.2d 918, 918 (1979). "[I]t is settled that one's mere presence in an apartment or house where contraband is found does not constitute sufficient basis for a finding of constructive possession." *People v. Edwards*, 206 A.D.2d 597 (1994). Dominion and control is generally established by "by proving that the defendant had ready access to the weapon or its storage place and that he admitted owning or using the weapon." *Vastola*, 70 A.D.2d at 918. "An inference of possession cannot be placed upon so slender a reed as the access a defendant shared with other adults who also could have owned the property." *Olivo*, 120 A.D.2d at 466–67.

Courts have routinely rejected claims of constructive possession of weapons absent strong evidence of dominion and control. For example, in *People v. Edwards*, 206 A.D.2d 597 (1994) the Court reversed the conviction of a man found sleeping near a firearm concealed in a bag in a living room, saying there was no "evidence indicating that defendant knew of the presence of, let alone exercised dominion over, the gun...." *Id*. at 598. Similarly, in *People v. Vastola*, 70 A.D.2d 918 (1979) the defendant admitted there was a gun in the home, and directed the police to it. The Court found that this knowledge "merely indicate[ed] access. Access is not

10

sufficient for a finding of guilt in view of the evidence that other adults were present in the house, many of whom could have possessed the same knowledge…." *Id.* at 918. In *People v. Robinson*, 28 Misc. 3d 1051 (Crim. Ct. 2010), the Court dismissed, as facially insufficient, the information against a man found with other men in a living room, with a rifle and ammunition in plain view on top of a living room table. In *People v. Brown*, 133 A.D.3d 772, 773 (N.Y. App. Div. 2015), *leave to appeal denied*, 26 N.Y.3d 1143 (2016), the Court reversed a conviction regarding a gun found in a bedroom, holding "[t]here was no evidence specifically connecting the defendant to the bedroom where the contraband was found, or otherwise connecting the defendant to the contraband." *Id.* at 773; s*ee also Jones v. City of N.Y.*, 13-CV-0703(BMC), 2014 WL 1427855, at *5 (E.D.N.Y. Apr. 14, 2014) ("the ultimate resting place of other guns in bedrooms cannot be attributed to plaintiff without information that he had some residency or regular access to a particular bedroom where a gun was found."); *People v. DeJesus*, 44 A.D.3d 464, 468 (2007); *People v. Bailey*, 159 A.D.2d 1009 (1990); *People v. Patel*, 132 A.D.2d 498 (1987).

Defendants cite cases which outline two theories of constructive possession. First, they cite cases where the person arrested was indisputably a resident of the dwelling. *See e.g. Cammick v. City of N.Y.*, 96-CV-4374 (RPP), 1998 WL 796452(S.D.N.Y. Nov. 17, 1998); *United States v. Morales*, 851 F. Supp. 112, 116 (S.D.N.Y. 1994). Here the plaintiffs did not reside in the apartment, and there was no basis for the officers to infer they did. Def's Ex. D at 76:24-25. Even if there was some basis to infer residence, there was still nothing to establish dominion and control of Furman's bedroom.

Secondly, defendants cite *United States v. Heath*, 455 F.3d 52 (2d Cir. 2006), suggesting *Heath* extends liability to visitors. However, the principal fact considered by the Court in *Heath*

11

was that the dwelling in question contained bags of cocaine in plain sight, and that Mr. Heath "could see them, and in fact would be expected to see them, in the regular course of walking through the small home's public spaces." *Heath*, 455 F.3d at 57. And the Court clarified that "The presence of any quantity of narcotics (or related contraband) in plain view in any location in a home does not, automatically, create probable cause to arrest every person present in that home." *Id*. at FN 4. Defendants would seek to extend Heath's ruling to precisely that scenario.

This case is more closely analogous to *Minter v. Cty. of Westchester*, 08-CV-7726 (WHP), 2011 WL 856269 (S.D.N.Y. Jan. 20, 2011) where the plaintiff was arrested in connection with "(1) the bag of drugs in the kitchen closet, (2) additional drugs and paraphernalia in the house, and (3) a single drug purchase allegedly made while Minter was in the house." *Id*. at *8. The Court denied summary judgment, saying that the contraband was "located in a private space in a house in which Minter did not reside, and there is no indication that Minter was aware of them." *Id*. at *9. Similarly, in *Davis v. City of N.Y.*, 04-CV-3299 (JFB)(RLM), 2007 WL 755190 (E.D.N.Y. Feb. 15, 2007) the Court found a question of fact as to whether probable cause existed to tie plaintiffs to ammunition found in their brother's closet in their home. "If . . . there is no evidence directly or indirectly linking them to the bullets in their brother's closet … they may be able to demonstrate a lack of probable cause on the charge of constructive possession of those bullets." *Id*. at *10; s*ee also Miyares v. City of N.Y.*, 11-CV-4297(RJS), 2013 WL 3940816, at *4 (S.D.N.Y. July 31, 2013) ("Without some factual record that Plaintiff saw the drugs, witnessed sales, or otherwise learned about trafficking, her mere presence in the apartment with her child on the morning in question is no more consistent with knowledge of drug activity than it is with ignorance."); *Williams v. Atl. City Dep't of Police*, 08-CV-4900 (JBS)(AMD), 2010 WL 2265215, at *5 (D.N.J. June 2, 2010) ("if the only fact

supporting Plaintiff's arrest was the presence of contraband that was not in plain view from common areas of the apartment, then probable cause would have been lacking and no reasonable officer could have thought it was present.").

Defendants have presented little if any evidence of a connection between plaintiffs and the firearm recovered, and certainly not enough to meet their heavy burden. With respect to plaintiff Kendall Massey, defendants point to only his mere presence in other areas of the apartment, and the supposed statement by Furman Massey linking his brother to the bedroom. However, viewing evidence in the light most favorable to the plaintiffs, that statement was never made. Defense counsel is apparently relying on the CPL 730.10 notice issued by the ADA in the criminal case as the basis for this statement. See Def's Ex. P. That document recounts a statement supposedly made by Furman Massey to Officer Azize inside Apartment 14F at 10:40 pm, shortly before the time of arrest. *Id*. However, Officer Azize has no recollection of this statement being made to him. See Def's Ex. D at 173:21-23. He testified that if such statements were made, he most likely would have recorded them in his memo book. *Id*. at 168:18-23,174:10-14. No such statement is recorded in his memobook. See Ex. 6. Accordingly, the only place this supposed statement exists is the unsworn document created by the ADA. And according to the ADA's notes, she learned it from her conversation with Officer Azize.  See Ex. 4.  Even if we assume that Furman Massey's statement may be admissible as non-hearsay for its effect upon the listener, and that the 730.10 notice were admissible under a hearsay exception, Azize's statement reporting Massey's statement is another level of hearsay for which no exception applies. Even if defendants could offer Furman Massey's supposed statement in admissible form, plaintiffs were there during the time this statement was allegedly made, and know that he did not state his brother Kendall stays with him in the room. Ex. 2 ¶13, 17, Ex. 3

13

¶12, 16. Viewing the evidence in the light most favorable to plaintiffs, the statement by Furman Massey must be disregarded. Accordingly, the only evidence left regarding Furman Massey is his mere presence in unrelated areas of Apartment 14F. As discussed above, that is simply not enough to establish dominion or control over the gun found in Furman's bedroom.

With respect to Gregory Roberts, defendants offer only that he was apparently asleep when the officers entered. However this "fact" is disputed by defendants themselves, as the officers claim they did not observe plaintiff asleep. Rather, they reported to the ADA that Mr. Roberts was "hanging out", and sitting on a bed in Furman's room. See Ex. 4.  No officer claims to have observed Mr. Roberts asleep. Even if the officers had observed Mr. Roberts dozing while sitting upright in a chair in the living room, this would still not be sufficient to connect him to the apartment generally, let alone to the unconnected room with concealed contraband. There is a stark difference between a person asleep in a bed or even lying on a couch overnight versus a person sitting upright, fully clothed, in a crowded living room with the television on. Defendants citation to *Caraballo v. City of N.Y.*, 10-CV-1885(SJR)(ML), 2012 WL 12883307 (E.D.N.Y. June 26, 2012), *aff'd*, 526 F. App'x 129 (2d Cir. 2013) is misleading. As was made clear on appeal, in *Caraballo*, "plaintiffs were sleeping in a small apartment in which police found drugs on more than one occasion, including at the time of the arrest, and that defendants found suspected MDMA in a common area of that apartment." *Caraballo v. City of N.Y.*, 526 F. App'x 129, 131 (2d Cir. 2013). The totality of those circumstances established probable cause. But the mere fact of being asleep in the living room does not make Mr. Roberts legally responsible for any and all contraband hidden in dresser drawers in other rooms in the apartment.

With respect to Jarvis Roberts, defendants offer two "facts" in support of probable cause. First, they allege that Mr. Roberts' ID "may" have listed Apartment 14F as his address. That

14

defendants are relying on such a speculative statement demonstrates that this is at most a question of fact for trial. Mr. Roberts could not recall what address was listed on his identification, but knew that he did not live at Apartment 14F and, when asked, told police his correct address. Ex. 2 at ¶21.  Accordingly, a reasonable jury could find that his identification did not list Apartment 14F as his address. But regardless, there is no evidence that defendants obtained Mr. Roberts' identification before he had been placed under arrest. Defendants cannot establish probable cause through use of information obtained after the arrest. *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). Finally, even if Mr. Roberts' identification did list Apartment 14F, it would still not connect him to Furman's bedroom specifically.

Second, defendants focus on the "tip" which supposedly indicated that Jarvis Roberts had a gun. At the outset, the Court should decline to consider the "tip" for purposes of this motion as there is a dispute of fact about whether it existed. As described in the facts above, the defendants' own accounts of this tip vary wildly. And the officers' recollection of the contents of the tip without any recollection of the source is convenient as it prevents any means to ascertain if the tip actually existed, or what information was contained in the tip.

The notion of a CI is also undercut by an amazing lack of mention of a CI in any paperwork. None of the officers recorded the contents of the supposed tip in their memo books, the arrest reports, or any complaint follow-up (DD5) reports. Neither the existence of an informant nor the contents of the tip were conveyed to the ADA assigned to the cases. See Ex. 4. This is surprising as the ADA would require that information at an eventual hearing pursuant to *People v. Darden*, 34 N.Y.2d 177 (1974). There is no evidence that any Field Intelligence Officer recorded this tip, as they would be required to do under police rules.  See Ex. 5. As a

15

result of the inconsistencies in the defendants' accounts, and the total lack of documentation, a reasonable jury could conclude that there was no tip regarding Jarvis Roberts.

Even if the tip had been made, the Court cannot consider it as defendants can only offer it in the form of inadmissible hearsay. While the existence of a tip from a CI may have "an effect on the listener" and therefore be admissible as non-hearsay, *see Richards v. City of New York*, 97-CV-7990, 2003 WL 21036365, at *6 (S.D.N.Y. May 7, 2003), the fact of the tip must still be offered in admissible form. *Cooper v. City of New Rochelle*, 925 F. Supp. 2d 588, 606–07 (S.D.N.Y. 2013) ("an unidentified Assistant District Attorney's notes of statements made presumably by O'Rourke concerning statements made by the confidential informant, as well as describing his encounter with Smith, constitute double hearsay and cannot be considered in deciding this motion").

Here the tip was allegedly made to an unknown officer, perhaps the unnamed Field Intelligence Officer but perhaps not. It then passed through an unknown number of people before supposedly being recounted by the Field Intelligence Sergeant. Each of these exchanges of information introduces another level of hearsay for which no relevant exception applies.[5] Defendants may assert that they can overcome hearsay objections by reliance on the "collective knowledge" rule. However, such a rule is inapplicable where officers cannot point to any specific officer or officers who possessed the relevant knowledge. *United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001) ("However, by not tracing the information back to any person with the training to make a determination of reasonable suspicion and relying instead on the collective

---

[5] Situations like this one are of course fairly common in police work, but police officers generally avoid this problem by recording intelligence in contemporaneously created police records, such as DD5 forms, which may qualify for various hearsay exceptions. But because there is apparently no recording of this tip, no such relevant hearsay exception applies. This is also further proof that no such tip was ever given.

16

knowledge of 'the department' generally, the government's argument takes the collective knowledge doctrine too far afield of the reasons underlying its purpose").

Even if the supposed tip can be offered in admissible form, it does not meet the requisite reliability for the defendants to rely upon it. In order for an officer to establish probable cause based on an informant's information, the informant must demonstrate sufficient indicia of reliability under the totality of the circumstances test. *Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002); *see also United States v. Gagnon*, 373 F.3d 230, 236 (2d Cir. 2004) ("the court may consider … an informant's veracity, reliability and basis of knowledge … and the extent to which an informant's statements—even about a suspect's innocent activities—are independently corroborated").   The burden is especially stringent when anonymous tipsters are involved. "Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity." *Florida v. J.L.*, 529 U.S. 266, 270 (2000) (citations and quotations omitted).

While Officer Azize called the tipster a CI, there is no evidence that he was actually a registered CI, nor that he had been assigned a registered CI number, or had been used in previous police activities. Officer Azize did not know anything about the tipster's track record, and could not recall if he ever knew who the tipster was.   See Def's Ex. D at 46:16-18, 56:12-24. Accordingly this is an anonymous tipster, deserving of the least reliance.   There was no information regarding the tipster's veracity, reliability or basis of knowledge. As such, the only means to make the tip reliable enough to act upon would be verification of the details provided. However, the tip apparently said nothing more than that Jarvis Roberts would be found with a

gun in Apartment 14F. It provided no predictive information, or other indicia of reliability. Accordingly, there was no basis to infer the tipster was sufficiently reliable to act upon.

Finally, even if there were some tenuous claim to arguable probable cause for any of the plaintiffs, any probable cause would be vitiated by Furman Massey's immediate claim that the gun was his, and/or his similar later written statement at the police precinct. An officer cannot deliberately disregard facts know to him at the time of arrest which eliminate probable cause. *Jocks v. Tavernier*, 316 F.3d 128, 136 (2d Cir. 2003). A reasonable jury could find that these statements undercut whatever limited probable cause might have existed.

Defendants established only the plaintiffs' presence in unrelated areas of a multi bedroom apartment, where a single piece of contraband was found concealed in a dresser in another separately locked bedroom. This is simply not enough to establish probable cause to arrest.

### III.   PLAINTIFFS JARVIS ROBERTS' AND KENDALL MASSEY'S CLAIMS FOR MALICIOUS PROSECUTION AGAINST OFFICER AZIZE MUST BE DECIDED BY A JURY.

Plaintiff Gregory Roberts agrees withdraw any claim for malicious prosecution made by him as he was not in fact prosecuted. Moreover, plaintiffs Jarvis Roberts and Kendall Massey agree to withdraw their malicious prosecution claim against all defendants except for George Azize. However, their claims against Azize must be decided by a jury.

A successful malicious prosecution claim must show 1) the initiation of a proceeding, 2) its termination favorably to plaintiff, 3) lack of probable cause, and 4) malice. *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003). Defendants focus their arguments in three areas. First they argue that defendants did not initiate the prosecution. Second they argue the prosecution was supported by probable cause. And third they argue that plaintiffs cannot establish a deprivation of liberty. Each of these claims must fail.

A.  Defendant Azize Initiated the Prosecution of the Plaintiff.

Defendants' brief relies on the idea that the prosecutor exerted independent judgment in deciding to prosecute plaintiffs. However, there was no opportunity for a prosecutor to exercise independent judgment when clouded by the false facts provided by Officer Azize. "Although there is a presumption that a prosecutor exercises independent judgment in deciding whether to initiate and continue a criminal proceeding, an arresting officer may be held liable for malicious prosecution when a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors." *Cameron v. City of New York*, 598 F.3d 50, 64 (2d Cir. 2010). "[G]enerally in malicious prosecution actions alleging that a police officer provided false information to a prosecutor, what prosecutors do subsequently has no effect whatsoever on the police officer's initial, potentially tortious behavior." *Id*. at 6; *see also White v. Frank*, 855 F.2d 956, 962 (2d Cir.1988); *Allen v. City of New York*, 480 F. Supp. 2d 689, 713 (S.D.N.Y. 2007); *Levy v. City of New York*, 935 F. Supp. 2d 575, 589-90 (E.D.N.Y. 2013). Furthermore, even where a prosecutor, grand jury or judge is not misled or coerced, a police officer may still be held liable for malicious prosecution when he can reasonably foresee that his misconduct will contribute to an otherwise "independent" decision that results in a deprivation of liberty. *Zahrey v. Coffey*, 221 F.3d 342, 352 (2d Cir.2000).

Here, defendant Azize provided false information to the prosecutor which led to Jarvis Roberts and Kendall Massey being prosecuted. He falsely claimed that these two men were in the room where the gun was recovered when the police entered the apartment.  Moreover, he reported supposed statements regarding the plaintiffs' connection to the room, which plaintiffs dispute were made, and which Azize himself can no longer remember being made. This false information prevented the prosecutor from exercising her independent judgment.

19

B.  <u>There Was No Probable Cause For the Prosecution of Plaintiff.</u>

As described regarding the false arrest claim, there was no probable cause for the arrest of plaintiffs. The facts did not change in favor of defendants between the time of arrest and the time of the prosecution being initiated. However, the burden is even higher in this context. "In the context of a malicious prosecution claim, there must be probable cause to believe that the plaintiff could be successfully prosecuted, which is distinct from probable cause to arrest a suspect." *Penree v. City of Utica, N.Y.*, 13-CV-01323(MAD)(ATB), 2016 WL 915252, at *18 (N.D.N.Y. Mar. 4, 2016), *aff'd in part, appeal dismissed in part sub nom. Penree by Penree v. City of Utica, N.Y.*, No. 16-828-CV, 2017 WL 2332535 (2d Cir. May 30, 2017); *see also Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 417 (2d Cir. 1999) ("The defendants seem to conflate probable cause to arrest with probable cause to believe that Posr could be successfully prosecuted. Only the latter kind of probable cause is at issue with respect to the malicious prosecution claim"); *Boyd v. City of N.Y.*, 336 F.3d 72, 77 (2d Cir. 2003).

Defendants have pointed to no additional information learned after arrest which would create probable cause to prosecute where it did not exist prior to arrest. Accordingly, to the extent the Court finds there was no probable cause to arrest, it should naturally follow that there was also no probable cause to prosecute. If anything, the argument for probable cause became weaker after Furman Massey's written statement made clear it was his firearm. See Def's Ex. P. However, if for any reason the Court finds probable cause did exist to arrest, it should then consider whether that probable cause would continue absent inadmissible or inherently unreliable evidence. *Boyd v. City of N.Y.*, 336 F.3d 72, 77 (2d Cir. 2003); *Gannon v. City of N.Y.*, 917 F. Supp. 2d 241 (S.D.N.Y. 2013). Specifically, the "tip" regarding Jarvis Roberts, even if it

20

was made, was likely inadmissible and unreliable as described above, and therefore cannot be the basis for probable cause to prosecute.

C.  Plaintiffs suffered sufficient post arraignment deprivation of liberty to state a claim.

Defendants argue plaintiffs have not established sufficient post-arraignment deprivation of liberty to establish a malicious prosecution claim. Defendants cite to *Perez v. Duran*, 962 F. Supp. 2d 533 (S.D.N.Y. 2013), but apparently did not read *Perez* in full, as there the Court concluded that any prosecution in New York requiring release on one's own recognizance after arraignment imposes restrictions sufficient to state a claim.

> [T]he evidence supports an inference that travel restrictions were imposed when the plaintiff was released on his own recognizance. New York law provides that "[u]pon ordering that a principal be released on his own recognizance, the court must direct him to appear in the criminal action or proceeding involved whenever his attendance may be required and to render himself at all times amenable to the orders and processes of the court."

*Id*. at 542 (*quoting* N.Y.Crim. Proc. Law § 510.40). *Perez* therefore rejected an extension of *Faruki v. City of N.Y.*, 517 F. App'x 1, 2 (2d Cir. 2013) to criminal prosecutions involved bail determinations, even where the arrestee was ultimately released on his own recognizance. *Id.*

**IV.    Plaintiffs' Fair Trial Claims Must Be Decided By a Jury**

Plaintiff Gregory Roberts agrees to withdraw his claims regarding denial of a fair trial, and Jarvis Roberts and Kendall Massey agree to withdraw their fair trial claims brought against all defendants except George Azize. However, the claims against Azize must be decided by a jury. To the extent defendants imply in their motion that they take issue with the level of facts pled in plaintiffs' Complaint, it must be noted that defendants have moved for summary judgment pursuant to Rule 56, not to dismiss pursuant to Rule 15. If the Court chooses to treat defendants' motion as a motion to dismiss, plaintiffs would be entitled to an opportunity to

amend their complaint before motion practice. Accordingly, plaintiffs focus their response on the substantive arguments, and ask the Court to order separate briefing on any Rule 15 motion.

The right to a fair trial is implicated when "an investigating official provides to the prosecutor fabricated evidence that is likely to influence a jury's decision, and the plaintiff suffers a deprivation of liberty as a result." *Perez v. Duran*, 962 F. Supp. 2d 533, 543 (S.D.N.Y. 2013) (quotations omitted). "A plaintiff need not have proceeded to a full trial on the merits in order to have an actionable section 1983 claim based on the denial of a fair trial." *Marom v. City of New York*, 15-CV-2017(PKC), 2016 WL 916424, at *9 (S.D.N.Y. Mar. 7, 2016) (citations omitted). "[T]he claim accrues when the officer forwards the false information to the prosecutors." *Garnett v. Undercover Officer C0039*, 13-CV-7083 (GHW), 2015 WL 1539044, at *4 (S.D.N.Y. Apr. 6, 2015). The claim "is not duplicative of [a] false arrest claim." *Long v. N.Y. City*, 14-CV-9908 (VEC), 2016 WL 4203545, at *4 (S.D.N.Y. Aug. 8, 2016). Plaintiff "may bring a right to a fair trial claim alongside his other § 1983 claims." *Betts v. Shearman*, 12-CV-3195(JPO), 2013 WL 311124, at *13 (S.D.N.Y. Jan. 24, 2013), aff'd, 751 F.3d 78 (2d Cir. 2014).

Here, Officer Azize presented two forms of false evidence to the ADA. First, he presented his claims that the plaintiffs were the bedroom where the gun was found with Furman Massey. That is in dispute, and for purposes of this motion the Court must assume this was false information. Such lies were certainly likely to influence the decision to prosecute, because if plaintiffs were in fact in the room where the firearm was recovered, it becomes much more likely that the ADA could develop a case for constructive possession. Secondly, Officer Azize presented several false statements attributed to Jarvis Roberts, Gregory Roberts, and Furman Massey. These statements served to bolster the supposed connection between plaintiffs and Furman's bedroom, and therefore were also likely to influence the decision to prosecute.

Defendants' conflate whether there was actually an effect on the prosecution vs. whether such effect was likely. A fair trial claim looks solely to the materiality of the fabricated evidence. *Soomro v. City of N.Y.*, 174 F.Supp.3d 806, 816 (S.D.N.Y. 2016). But in any case it was clear that these false statements had an actual effect because the ADA chose not to prosecute Gregory Roberts, for whom the attributed statements were most tenuous.

With respect to whether plaintiffs were sufficiently deprived of liberty, the same analysis applies here as in the preceding section regarding malicious prosecution.

## V.      THE DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

The doctrine of qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted). A court determining qualified immunity must first ask "do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If so, the court must then "ask whether the right was clearly established." *Id. See also Pearson v. Callahan*, 555 U.S. 223 (2009) (holding that the sequence of the *Saucier* two-step analysis is not mandatory). Whether a defendant is entitled to qualified immunity is based on an objective standard. *Lennon v. Miller*, 66 F.3d 416, 420-421 (2d Cir. 1995).

Qualified immunity cannot be the basis for summary judgment where there are material questions about the nature of defendants' actions. *Weaver v. Brenner*, 40 F.3d 527, 537 (2d Cir. 1994) ("Since defendants hotly dispute plaintiff's allegations, a factual determination of their conduct is needed to resolve the issue of qualified immunity"). This is especially true where there is an allegation that a law enforcement officer has misrepresented or fabricated evidence.

"[W]here, as here, there is a triable question of fact as to whether Defendant knowingly misrepresented the evidence to prosecutors in relation to the issue of probable cause, the Court cannot make a determination as to qualified immunity on a motion for summary judgment." *Knox v. Cnty. of Putnam*, 10-CV-1671(ER), 2012 WL 4462011 (S.D.N.Y. Sept. 27, 2012).

"It is clearly established that probable cause for the arrest of individuals in a household based on the presence of contraband depends on there being some fact suggesting knowledge of the contraband above and beyond the individual's mere presence in the household." *Williams v. Atl. City Dep't of Police*, 08-CV-4900 (JBS/AMD), 2010 WL 2265215, at *5 (D.N.J. June 2, 2010). Accordingly, "if the only fact supporting Plaintiff's arrest was the presence of contraband that was not in plain view from common areas of the apartment, then probable cause would have been lacking and no reasonable officer could have thought it was present." *Id*. Similarly, the fact that only a reliable informant may grant probable cause is clearly established. *McColley v. Cty. of Rensselaer*, 740 F.3d 817, 825–26 (2d Cir. 2014) ("If the CI's information … was not reliable, then reasonable officers would not disagree as to the lack of probable cause. The dissent would have the doctrine of arguable probable cause swallow the entire rule of qualified immunity as well as the related limitation on our jurisdiction. This cannot be.").

Defendants focus their argument as to qualified immunity on simply repeating their arguments as to probable cause. Defendants only new argument is a citation to *United States v. Traylor*, 396 F. App'x 725, 727 (2d Cir. 2010). However, in *Traylor* the Court found probable cause based on the facts of "

> two prior drug sales at the apartment, supported officers' belief that the premises were used for drug trafficking. The minimal furnishings in the apartment and lack of personal belongings further supported a reasonable inference that the premises were used exclusively for this unlawful purpose. Traylor's presence in the locked apartment with a young woman who volunteered that he had brought her to the location signaled his access to and control over the entirety of the premises.

*Id.* at 727. *Traylor* involved much more than presence in a dwelling with concealed narcotics as defendants would lead the court to believe.  As there are no similar allegations, it is inapplicable here.

The law of constructive possession is clear. This is not a case where the defendants were not aware the law required them to connect plaintiffs to the contraband found. Defendants contend they did so by plaintiffs' presence in the room with the contraband. But that claim is disputed. Accordingly, this is distinctly not a question of qualified immunity.

## VI.    DECISION ON PLAINTIFFS' FAILURE TO INTERVENE CLAIMS SHOULD BE RESERVED UNTIL TIME OF TRIAL

Plaintiffs agree that Officers Azize and Peters were personally involved in this incident. However, to the extent either defendant later claims lack of personal involvement while other officers affected the arrests, and/or to have been "just following orders", plaintiffs should be entitled to offer a failure to intervene theory in the alternative. Accordingly the Court should reserve decision on this claim until the time to charge the jury.

## VII.    THE MUNICIPLE LIABILITY CLAIM HAS BEEN SEVERED BY THE COURT

The Court previously ordered the municipal liability claim bifurcated and severed from the individual claims. Accordingly, the Court should continue its prior order and reserve any action on the municipal liability claim until after the individual claims have been resolved.

## CONCLUSION

This case comes down to a factual dispute over who is telling the truth. It is incumbent upon a jury to determine who that is. Accordingly defendants' motion must be denied.

DATED:    July 14, 2017          **Stoll, Glickman & Bellina, LLP**
             Brooklyn, New York

_____
By: Nicholas Mindicino

25